**McGLINCHEY STAFFORD, PLLC**
112 West 34th Street, Suite 1515
New York, New York 10120
Telephone: (646) 362-4000
T. Dylan Reeves, Esq.
*Special Litigation Counsel for Goldner Capital Management LLC, et al.*,

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

In re:

GOLDNER CAPITAL MANAGEMENT LLC, <u>et al.</u>,[1]

          Debtors.

-------------------------------------------------------------X

GOLDNER CAPITAL MANAGEMENT LLC, <u>et al.</u>,

          Plaintiffs,

CAPITAL SOURCE, LLC, THE CAPITAL
FORESIGHT LIMITED PARTNERSHIP,
VERTICAL HEALTH SERVICES, LLC,
GLEN HENDREN DRIVE HEALTHCARE LLC,
CRESCENT MOON DR HEALTHCARE LLC,
BERMUDA DRIVE HEALTHCARE LLC,
CEDARS COURT HEALTHCARE LLC,
SOUTHWEST 2ND STREET HEALTHCARE LLC,
TALBOT RD S 1 HEALTHCARE LLC,
BRIDGEPORT WAY W HEALTHCARE LLC,
BROADWAY HEALTHCARE LLC,
MCCUTCHEN ROAD HEALTHCARE LLC,
CLAY STREET HEALTHCARE LLC,
REDMAND RD HEALTHCARE LLC,
RAYTOWN ROAD HEALTHCARE LLC,
3RD ST. HEALTHCARE LLC,
COLLEGE ST HEALTHCARE LLC,
NORTH 9TH STREET HEALTHCARE LLC,
WEST 18TH STREET HEALTHCARE LLC,
WEISENBORN ROAD HEALTHCARE LLC,
BLANCO RD HEALTHCARE LLC, and
ROCKINGHAM DR HEALTHCARE LLC,

          Defendants.

-------------------------------------------------------------X

Chapter 11
Case No. 24-73789 (AST)
     (Jointly Administered)

Adv. Pro. No. 25-

## <u>VERIFIED COMPLAINT</u>

---

[1] The jointly administered Debtors are: Goldner Capital Management LLC (24-73789), GCM Manager LLC (24-73790), GCM Parkside LLC (24-73791), GCM UP LLC (24-73792), GCM Wash LLC (24-73793), LHW Master Tenant LLC (24-73794) and Missouri MT Holdings LLC (24-73795). LHW Master Tenant has been deconsolidated by Order dated January 28, 2025 [Dkt. No. 52].

For their Complaint against Defendants Capital Source, LLC, The Capital Foresight Limited Partnership (collectively, "Capital" or "Capital Foresight"), Vertical Health Services, LLC ("VHS"), Glen Hendren Drive Healthcare LLC, Crescent Moon DR Healthcare LLC, Bermuda Drive Healthcare LLC, Cedars Court Healthcare LLC, Southwest 2nd Street Healthcare LLC, Talbot RD S 1 Healthcare LLC, Bridgeport Way W Healthcare LLC, Broadway Healthcare LLC, McCutchen Road Healthcare LLC, Clay Street Healthcare LLC, Redmand Rd Healthcare LLC, Raytown Road Healthcare LLC, 3rd St. Healthcare LLC, College St Healthcare LLC, North 9th Street Healthcare LLC, West 18th Street Healthcare LLC, Weisenborn Road Healthcare LLC, Blanco Rd Healthcare LLC and Rockingham Dr Healthcare LLC (collectively, "Tenant Entities") and Plaintiffs Goldner Capital Management LLC, GCM Manager LLC, GCM Parkside LLC, GCM UP LLC, GCM Wash LLC, Missouri MT Holdings LLC, and SRZ Master Tenant LLC (collectively "Debtors") state as follows:

## JURISDICTION & VENUE

1.      This Court has jurisdiction of this adversary proceeding under 28 U.S.C. §§ 157(a), (b)(2)(A), (B), (E), , (H), (K), and (O) and 28 U.S.C. § 1334(b).

2.      Venue is proper under 28 U.S.C. § 1409(a) because this proceeding is related to the above referenced bankruptcy case, currently pending in this Court.

3.      Plaintiffs consent to the entry of final orders and judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

4.      Plaintiff Goldner Capital Management LLC ("Goldner Capital") is a limited liability company headquartered in Valley Stream, New York that is the debtor in this action.

5.      Plaintiff GCM Manager LLC is a limited liability company headquartered in Valley Stream, New York that is the debtor in 24-73790.

6.      Plaintiff GCM Parkside LLC is a limited liability company headquartered in Valley Stream, New York that is the debtor in 24-73791.

7.      Plaintiff GCM UP LLC is a limited liability company headquartered in Valley Stream, New York that is the debtor in 24-73792.

8.      Plaintiff GCM Wash LLC is a limited liability company headquartered in Valley Stream, New York that is the debtor in 24-73793.

9.      Plaintiff Missouri MT Holdings LLC is a limited liability company headquartered in Valley Stream, New York that is the debtor in 24-73795.

10.     Plaintiff SRZ Master Tenant LLC is a limited liability company headquartered in Valley Stream, New York.

11.     Defendant Capital Source, LLC ("Capital Source") is a limited liability company that has voluntarily appeared in this action and submitted to this Court's jurisdiction.

12.     Defendant The Capital Foresight Limited Partnership ("Capital Foresight") is a limited liability company that has voluntarily appeared in this action and submitted to this Court's jurisdiction.

13.     Defendant Vertical Health Services, LLC is a limited liability company headquartered in Washington that has voluntarily appeared in this case and submitted to this Court's jurisdiction.

14.     Defendant Glen Hendren Drive Healthcare LLC is a limited liability company with an address at 2201 Glen Hendren Drive, Liberty, MO 64068.

15.     Defendant Crescent Moon DR Healthcare LLC is a limited liability company with an address at 10851 Crescent Moon Drive, Houston, TX 77064.

16.     Defendant Bermuda Drive Healthcare LLC is a limited liability company with an address at 5303 Bermuda Drive, Normandy, MO 63121.

17.     Defendant Cedars Court Healthcare LLC is a limited liability company with an address at 6400 The Cedars Court, Cedar Hill, MO 63016.

18.     Defendant Southwest 2nd Street Healthcare LLC is a limited liability company with an address at 80 SW 2nd St, Renton, WA 98057.

19.     Defendant Talbot RD S 1 Healthcare LLC is a limited liability company with an address at 4430 Talbot Rd S, Renton, WA 98055.

20.     Defendant Bridgeport Way W Healthcare LLC is a limited liability company with an address at 5520 Bridgeport Way West University Place, WA 98467.

21.     Defendant Broadway Healthcare LLC is a limited liability company with an address at 8223 Broadway, San Antonio, TX 78209.

22.     Defendant McCutchen Road Healthcare LLC is a limited liability company with an address at 1200 McCutchen Rd, Rolla, MO 65401.

23.     Defendant Clay Street Healthcare LLC is a limited liability company with an address at 2840 W Clay St, St Charles, MO 63301.

24.     Defendant Redmand Rd Healthcare LLC is a limited liability company with an address at 2600 Redman Rd, St. Louis, MO 63136.

25.     Defendant Raytown Road Healthcare LLC is a limited liability company with an address at 6124 Raytown Rd, Raytown, MO 64133.

26.     Defendant 3rd St. Healthcare LLC is a limited liability company with an address at 1501 SW 3rd St, Lee's Summit, MO 64081.

27.     Defendant College St Healthcare LLC is a limited liability company with an address at 1200 West College Street, Liberty, MO 64068.

28.     Defendant North 9th Street Healthcare LLC is a limited liability company with an address at 811 North 9th Street Saint Joseph, MO 6450.

29.     Defendant West 18th Street Healthcare LLC is a limited liability company with an address at 3002 North 18th St Saint Joseph, MO 64505.

30.     Defendant Weisenborn Road Healthcare LLC is a limited liability company with an address at 1616 Weisenborn Road Saint Joseph, MO 64507.

31.     Defendant Blanco Rd Healthcare LLC is a limited liability company with an address at 8020 Blanco Rd, San Antonio, TX 78216.

32.     Defendant Rockingham Dr Healthcare LLC is a limited liability company with an address at 1111 Rockingham LN Richardson, TX 75080.

## **INTRODUCTION TO THE THEORIES OF LIABILITY**

33.     Goldner Capital is an investment firm focused on post-acute health care, primarily investing in real estate and operations of skilled nursing facilities. Goldner Capital has operated in 7 states, employing over 6,500 people at its peak. Samuel Goldner ("Goldner") a young entrepreneur, built and operated Goldner Capital and its subsidiary entities.

34.     Along the way to building Goldner Capital, Goldner encountered alleged billionaire Netanel Saidoff ("Saidoff"). When Saidoff positioned himself to mentor Goldner, as any young entrepreneur would, Goldner welcomed Saidoff's mentorship and involved Saidoff in Goldner's companies, and the intricacies of the health care industry. Saidoff was not previously intricately involved directly in the industry and made his money in real estate in Israel.

35.     Goldner developed a close relationship with Saidoff and trusted him to guide the process of financial building of the entities and the nuances of structured finance deals. With that cultivated trust, Goldner believed that they would operate as joint venture partners and started to disclose confidential proprietary information related to extensive financial benefits the Goldner Companies possessed. As will be set forth below, the chronology of events and the facts that unfolded demand the ultimate conclusion that Saidoff provided promises, representations, money, power, and comfort level, only to then go behind Goldner's back and strip the value of the Debtors' assets. The problem is he got caught as Goldner sought the protections of the Bankruptcy Court to unravel this.

36.     Through a private and confidential offering memorandum that Goldner Capital shared with Saidoff, Saidoff obtained specific and proprietary knowledge of the Goldner Capital's companies very valuable purchase option on a portfolio of properties with Omega Health Investors, LLC ("Omega") ("Purchase Option"). The private memorandum showed that the Purchase Option was 80% of the value of the entire proposed portfolio. In fact, the private offering memorandum listed the Purchase Option as the collateral and the equity opportunity. The entire upside of the deal was contained in the Purchase Option.

37.     When Goldner Capital experienced some financial difficulties, Capital influenced Goldner to lease and sublease the 20 nursing home facilities it operated and maintained to various defendant entity tenants, which subleases would be guaranteed by defendant VHS, a company controlled by Saidoff.

38.     While Goldner and Saidoff were analyzing the Purchase Option and how best to utilize it, Saidoff made extension payments directly to Omega on behalf of the Debtors to preserve

the Purchase Option.  At this time, Goldner and Saidoff were using the same counsel to represent both interests to negotiate extensions of the Purchase Option.

39.    Despite his position of trust and as a lender with the responsibility of fair and ethical duties and the fiduciary duty as a partner in one of the debtors – Missouri MT Holdings ("MT Holdings"), Saidoff coveted the lucrative value of the Purchase Option for himself. And then Saidoff took it.

40.    Since the Goldner Capital's companies had a contractual right to the Purchase Option, Saidoff had to manufacture a default. He  could not sabotage Goldner Capital's companies alone, so he enlisted VHS and its executive, Bill Miller, to help ruin the Debtors.

41.    VHS was the guarantor of the various defendant tenant entities and operators for many of the skilled nursing facilities that Goldner Capital's companies owned. Saidoff and his companies, along with Miller and his companies, developed a scheme whereby VHS voluntarily elected not to pay rent to any of Goldner Capital's companies across 19 facilities as well as payments due directly to the landlords. A schedule of the entities and the past due rent is annexed hereto as **Exhibit A**. This shows rent due to the various facilities and for the ultimate benefit of the Debtors in excess of $31MM.

42.    Before Goldner Capital's companies defaulted and lost the Purchase Option, in an extraordinary act of self-dealing, Saidoff and his companies enlisted Jung Park ("Park") of Ventura Coast Capital, LLC ("Ventura") to negotiate and purchase the Purchase Option from Omega away from Goldner Capital's companies.  Once he had Mr. Park, Saidoff elected not to pay the monthly rent that he was paying each month before that (June 2023 to September 2023), and caused a default of the Base Rent and the corresponding Purchase Option extension.

43.     On October 5, 2023, Leighton Aiken, Esq., Omega's counsel, sent an email indicating that the October 2023 rent was not paid and there would be a default.  When Goldner approached Saidoff as to why the rent was not paid or the Purchase Option extension, Saidoff advised Goldner not to worry as he hired a consultant who has "a relationship with Omega's inside people", and everything will work out. According to Goldner, Saidoff advised Goldner that he would not fund any further option extensions until his consultant (Mr. Park) finished the deal with Omega. In essence, he was creating leverage for him and the Debtors over Omega.

44.     At the time of the Omega rent default (October 2023), Goldner was in a precarious position to lose its valuable Purchase Option.

45.     According to Goldner, he had extensive daily conversations with Saidoff, and has text messages and emails about the created default.

46.     Each time Saidoff continued to advise Goldner not to worry as Saidoff knew   what he was doing.

47.     According to Goldner, he later learned that Saidoff directed Mr. Park to go behind the Debtors and contact Vikas Gupta, Omega's in house negotiator, to "make the rent arrears issue and Option extension right." This was a crucial piece in the line of fabricated defaults that occurred thereafter.  In fact, the Debtors believe the evidence will show Saidoff paid Omega a full year rent in advance to provide Omega a comfort level that Saidoff would exercise the Purchase Option on his own.[2]

48.     Capital and Saidoff did not cause the Debtors' default until the Debtors had transferred 19 of its facilities to VHS.

---

[2] This Court is familiar with the massive efforts to prevent discovery from Saidoff, VHS and all of the third party entities, which would seal the evidence and corroborate the Debtors allegations set forth herein.

49.     The Transfer of the 19 facilities occurred between June 2023 and October 2023.

50.     Once Capital had all facilities transferred to VHS, it no longer made the monthly rent payments on the 11 Omega facilities.

51.     Goldner Capital could not withstand the economic impact of Saidoff's control and VHS's rent embargo on nineteen (19) facilities.[3] As Capital and VHS squeezed the financial life from the Debtors through their rent embargo, once the Purchase Option was lost, it provided Saidoff with an opportunity to negotiate a new purchase and sale agreement with Omega for the defaulted Purchase Option.  Significantly, Saidoff did not have any access to Omega or the Purchase Option but for Goldner Capital, its private memorandum, and its related entities.

52.     Amazingly, while being joined at the hip with the Debtors for a significant period of time, and analyzing, negotiating, and being part of the Purchase Option, and even making the monthly rent payments and extension payments to preserve it, Saidoff decided to cause the Debtors to default, and then swoop in and capture the lucrative Purchase Option for himself.

53.     Taking the Purchase Option did not end Saidoff's greed as he wanted everything. Once he had the Omega Purchase Option, he squeezed the Debtors by continued rent payment defaults around the country on 19 facilities and then elected to create a fabricated retroactive default with the Goldner Capital entities. This occurred once he had all of the leases in his name and control of the flow of money and failure to pay monthly rent.

54.     Prior to this occurring, Goldner had full access to the financial accounts of VHS. He could see each month hundreds of thousands of dollars in excess cash flow.

---

[3] A coincidence is defined as "a remarkable concurrence of events or circumstances without apparent casual connection". The Debtors believe that 19 facilities controlled by the same person not paying rent practically at the same time is no coincidence.

55.     Saidoff and his entities had extended forbearance agreements with the Debtors, providing them with an unmistakable belief that they were effectively joint partners and no longer adversaries and had entered into memorandums of understanding to sell all of the subject assets and distribute the proceeds accordingly ("MOU").

56.     Knowing he could make much more money by declaring a fabricated default, as he now possessed the lucrative Omega Purchase Option, it was an easy business decision for Saidoff. In essence, it would be much cheaper to fabricate a default than follow through with the joint venture opportunity with the Debtors.  If he had to pay damages later, he was challenging Goldner to have the guts and wherewithal to litigate against him, an experienced and wealthy entrepreneur.

57.     In this business act, Saidoff would get everything and the young entrepreneur would learn a valuable lesson in trust. The problem is that Saidoff was sloppy and. made too many mistakes.  His acts were unlawful and a massive breach.

58.     Based on the fabricated default, Capital wrongfully attempted to foreclose on pledge agreements and remove Goldner as the manager of Goldner Capital's companies. This attempt would have allowed Saidoff to stand in the shoes as manager, lender, and equity owner of all of the Debtors' entities around the country, a position of extreme control.

59.     What Saidoff fails to realize is that he only had a security interest in the economic value of the membership interest on the pledge and did not have the right to take over management of the entities.  More importantly, due to Federal Rules and Regulations, the Debtors could never have provided Saidoff with management authority as the only way to take over a skilled nursing facility is through a receivership action, under the auspices of the Federal Court, and according to

precise rules, regulations and notices.[4]  Specifically, a lender cannot take over the managerial rights of an entity without getting prior approval from the Department of Health. Given that by removing Goldner as manager of the managerial company Saidoff would be in violation of the many state and federal requirements for operating a nursing home and therefore not permissible. Furthermore, under Delaware law and the company agreements, a lender can only foreclose on the economic interest and cannot take away managerial rights.

60.    Although the law requires disposition of assets in a commercially reasonable manner, Capital crafted a proposed public sale in a private way to ensure that no other purchaser would receive notice or appear at the sale and Capital could obtain the assets through a private sale without letting anyone know the time or address of the sale.

61.    Saidoff's plan to destroy Goldner Capital's companies did not end there. VHS and its companies remain as operators in facilities identified on **Exhibit A**. By operating these facilities in such a reckless manner, the various Tenant Entity defendants, VHS and Saidoff have attempted to destroy the value of the Debtor's assets.

62.    According to the Debtors, they believe the coordinated effort of nineteen (19) facilities, the Tenant Entities and VHS to withhold rent throughout the country is intentional and deliberately fashioned to strangle the Debtors. Knowing Saidoff's control and inability to be told what to do, Goldner believes that Capital has been paid substantially, if not, all of its money loaned to the Debtors.  And if one includes the  value of the lost Purchase Option, Saidoff is no longer a creditor, and actually owes the Debtors tens of millions of dollars.

### ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

**A.**        **Background Relationship of the Parties**

---

[4] Providing Saidoff with control would also violate all of the lending agreements the Debtors have with their traditional lending institutions.

63.     Goldner Capital operates as an investment holding company and is the direct or indirect owner of a majority of the membership interests of, among other entities, the other six Debtors: GCM Manager LLC ("GCM Manager"), GCM Parkside LLC, GCM UP LLC, GCM Wash LLC, LHW Master Tenant LLC, and Missouri MT Holdings LLC.

64.     Capital Source is managed by its principal, Netanel Saidoff.

65.     Defendant VHS is managed by William Miller.

66.     According to the Debtor, upon information and belief, Capital and Saidoff control and direct the financial decisions of VHS.

67.     Goldner was a young entrepreneur that Saidoff provided with guidance, mentorship and stewardship. Goldner admired Saidoff as a brilliant entrepreneur whom Goldner looked up to and would, at times, defer to Saidoff based upon Saidoff's promises and assurances of guidance and joint profitability. This pattern was a consistent theme that reassured Goldner and made Goldner feel very comfortable with Saidoff. Many times, agreements and understandings were reached quickly based on oral conversations with Saidoff and Goldner's belief that Saidoff would never undermine the Debtors and Goldner for his own benefit.

**B.      The Valuable Town & Country Purchase**

68.     In or about early 2021, the Goldner Companies, through Goldner, learned of a valuable opportunity identified as Town & Country. Town & Country is a beautiful facility with 238 beds on 6 acres of pristine high valuable real estate in an affluent community in St., Louis Missouri.

69.     According to Goldner, on behalf of the Debtors, he introduced Saidoff to Town & Country and the value of this facility and its real estate.

70.     In or about early 2021, the Goldner Companies had an opportunity to purchase Town & Country for $6.1MM, substantially below market, due to Covid-19 concerns and poor management.

71.     The Goldner Companies purchased Town & Country for approximately $6.1MM and Saidoff was told about the below market value purchase. Saidoff advised Goldner to use Town & Country as additional collateral as they build out their businesses together.

72.     After the closing, Goldner and his staff rehabilitated Town & Country and made the facility profitable.[5]

73.     The current value of Town & Country is at least $30MM.

74.     In or about May 26, 2023, as will be described below, Saidoff convinced Goldner, through debtor MT Holdings, to sell Capital Town & Country for the value of the debt at the time, which was approximately $6.2MM.

75.     Trusting Saidoff, the debtor MT Holdings sold Capital Town & Country for an amount substantially under market value.

76.     This was a crucial piece in reducing the debt to Capital as the first Memorandum of Understanding dated five (5) days later on May 31, 2023 (the "First MOU") contemplated selling and/or refinancing Town & Country and reducing the current outstanding debt to Capital at that time.

77.     At the time of the closing, Town & Country (the real estate and business operations) had a value of $20MM.

---

[5] As of the date hereof, the Debtors believe that Town & Country has a value of $30MM.

78.     At this time, Capital sent a text to Goldner indicating that Saidoff had spoken to a lender and was seeking a conservative $25MM from a lender on a refinance of Town & Country. This refinance would have satisfied the entire debt owed by the Debtors to Capital.

79.     Once the closing occurred, the debtor MT Holdings caused the operating company of Town & Country to be transferred to defendant VHS.

80.     After the Town & Country Closing, Saidoff had possession of the real estate, valued at $21MM, and the operating entity, through VHS, valued at $10MM.

81.     Debtor MT Holdings was the owner of Town & Country and sold the valuable asset to Saidoff for substantially below market value so that it could be utilized as additional collateral to Saidoff for the expansion of the businesses that the Debtors and Saidoff were involved in throughout the country.

82.     At the time, Goldner wanted the then outstanding debt to Capital to be reduced, but Saidoff indicated that it should "remain in place" so he can let third party lenders know of their connection and how much he has invested with the Debtors, as reflected in the text messages identified above.

83.     Trusting Saidoff, the debtor MT Holdings left the then outstanding debt in place after the May 2023 closing for Town & Country.

84.     At the time, the Debtors believed they were in a joint venture opportunity with Capital.

85.     In emails from Capital Foresight employees, the purchase of Town & Country was factored as debt owed to Capital Foresight in the First MOU and would be a credit in favor of the Debtors.

**C.     The Purchase of Renton, Talbot & University Place**

14

86.     In or about March 1, 2021, Saidoff and Goldner met in connection with the purchase of two (2) facilities called Renton & Talbot which were in bankruptcy at the time.

87.     According to Goldner, Saidoff was a limited investor and losing money each month on those properties.

88.     According to Goldner, Saidoff enlisted Goldner's help.

89.     According to Goldner, the Debtors agreed to purchase the properties out of bankruptcy and rehabilitate them.

90.     For the two properties (Renton & Talbot), non debtors, WA 3 Properties Renton LLC and WA 3 Properties Talbot LLC paid $10MM and Saidoff financed $7.5MM.[6]

91.     One month later, non-debtor WA3 Univ, LLC purchased a third property ("University Place") for $8MM and Capital financed $8.1MM, essentially due to working capital deficiencies.[7]

92.     In or about May 5, 2022, the Debtors refinanced Renton & Talbot with a new traditional lender – Merchant Bank of Indiana ("MBI") – and Saidoff was fully paid.

93.     On or about July 19, 2022, the Debtors refinanced the third property, University Place, with MBI and Capital was fully paid.

**D.      The Government Reimbursements and Request for Funding from Capital**

94.     In or about May 2022, to address the increased expenses and shortfall of government reimbursements from Covid-19, GCM secured a $14MM loan from Capital Source ("May 2022 Loan").

---

[6]     The non debtors identified therein are owned by debtor GCM Wash, LLC.
[7]     This non debtor is owned by debtor GCM UP, LLC

95.     On May 20, 2022, Goldner Capital and GCM Manager signed a pledge agreement purporting to pledge their economic membership interests in GCM Manager, GCM Parkside LLC, GCM UP LLC, and GCM Wash LLC as security for Capital Foresight and the May 2022 Loan.

96.     At the time of the May 2022 Loan, Goldner Capital's Missouri-based entity, debtor MT Holdings, was a tenant of 19 nursing homes and the owner of the real estate of 5 of those nursing homes.

97.     Capital knew of the value of the debtor MT Holdings assets.

98.     At the same time, in or about March, 2022, order to provide a further comfort level to Capital, the Debtors provided Capital with a confidential private placement memorandum and the lucrative business value ("PPM").

99.     Aside from the PPM, the only collateral provided to Capital was Town & Country and the Omega Purchase Option. Aside from this, Capital is seeking to take over all of the Debtors assets all over the place wherever located.

100.    The PPM disclosed private confidential information related to the Debtors business enterprise, its assets and business opportunities, including the Omega Purchase Option.

101.    Debtors MT Holdings, through its wholly-owned subsidiary, SRZ Master Tenant LLC ("SRZ"), also held a 2018 purchase option in its lease with Omega Health Investors, LLC ("Omega"), its landlord, to buy 11 skilled nursing facilities with 1,775 beds at a fixed price of $36,000 per bed ("Purchase Option"), a price significantly below the market rate of $60,000-$70,000 per bed.

102.    The Purchase Option was valued at approximately $42.6MM to $60.35MM and served as additional collateral for the May 2022 Loan.

103.    In December 2022, Goldner Capital experienced further financial strain due to hurricane damage. As a result, Capital Foresight provided the Debtors with additional loans between December 2022 and April 2023 (collectively, "Additional Loans").

104.    At the time of the Additional Loans, Capital knew of the Omega Purchase Option and the lucrative value that existed therein.

105.    These Additional Loans consisted of:

(a)    on or about December 12, 2022, Capital provided an additional loan of approximately $1,500,000;

(b)    on or about March 24, 2023, Capital provided an additional loan of approximately $1,300,000;

(c)    on or about March 29, 2023, Capital provided an additional loan of approximately $1,800,000; and

(d)    on or about April 26, 2023, Capital provided an additional loan of $2,000,000.

106.    After the Additional Loans, the total amount of all loans totaled approximately $20.6MM ("Total Loans").

107.    Around this time, in or about February 13, 2023, according to Sam Goldner, based on direct conversations he had with Saidoff, Capital Foresight began defaulting on its own credit lines due to liquidity issues and impaired covenants, including defaults on credit lines, losses from declining stock prices, and lender concerns regarding its healthcare investments.

108.    Because Goldner Capital's Seattle-based nursing homes were profitable while Capital Foresight's assisted living facility in Seattle was struggling, according to Goldner, in or about January 2023, Saidoff contacted Goldner and asked for assistance in managing Capital Foresight's assisted living facility.

109.    Goldner agreed to help and authorized Goldner Capital's Seattle-based portfolio CEO, William Miller ("Miller"), to consult for Capital. Miller was working for a subsidiary of GCM at the time.

110.    With Goldner's help, Capital Foresight's Washington facility was restructured and became profitable.[8]

111.    With the consent of Goldner, based on his close relationship with Saidoff, Miller left Goldner Capital and began working for Capital as Capital 's head of their nursing home operating company, defendant VHS.

112.    According to Goldner, Miller and Saidoff operated VHS.

113.    According to Goldner, Saidoff and Miller funded VHS with a convertible loan from Capital.

**E.    The Omega Purchase Option and 13 Amendments Thereto**

114.    Starting in June, 2020, the debtor SRZ and its equity owner MT Holdings, entered into a first amendment to the Master Lease.

115.    Leighton Aiken, Esq., was the attorney responsible for the amendments to the Master Lease.

116.    Debtors SRZ and MT Holdings and Omega entered into a total of 13 Amendments to the Master lease for the purpose of extending the deposit and deadlines related to the Purchase Option (collectively, "Amendments").

117.    The Amendments became a course of dealing and a pattern of extensions of the Purchase Option for a period of three (3) years.

---

[8]    Capital advised Goldner that he refinanced the Washington facility with Israel Discount Bank ("IDB") after Goldner's assistance in rehabilitating it.

118.    According to Recitals, para C, each amendment was for the purpose of amending the Purchase Option.

119.    In the middle of the Omega Option negotiations, on or about June 2023, Capital Foresight, by Saidoff, sent an email to Goldner and their joint counsel about the Omega Option stating,

> The real deal between us is that, I will buy the properties. I will be entitled to a return of 11-12%. On $78M, then we split the profits on the OPCO. When we sell anything above, I think $91,000 per bed. I don't recall the exact number, would be split.

120.    According to the above and additional emails, text messages and Goldner's conversations with Capital, through Saidoff, Capital was providing Omega with a comfort level and acting on behalf of the Debtors to preserve the value of the Purchase Option.

121.    According to the Debtors, Capital and the Debtors were effectively in a joint venture relationship and would exercise the option and sell the properties.

122.    According to the Debtors, at this time, the Debtors were hand in hand with Capital pursuing the opportunity.

123.    According to the Debtors, Capital took a controlling interest in the decision making and advised the Debtors of different actions, strategies and what to do.

124.    According to the Debtors, Capital was providing all of the financing, would then earn an interest factor on its money, a return of its principal and then a split of the sale proceeds.

125.    Based on a course of dealing, texts and emails, Capital agreed to share the proceeds with the Debtors.

126.    On June 7, 2023, according to the Debtors, Rosalee Braunstein at rosalee@capitalforesight.com confirmed to Mr. Goldner that $938,925.26 was sent by Capital

Foresight to Omega (identified in the email as OHI) as a deposit for the Omega Purchase Option extension.

127.    Capital made other additional payments to Omega on behalf of the Debtors for the Purchase Option extension and the monthly rent due ($534,000) to Omega for the Master Lease on eleven (11) facilities.

128.    To further corroborate this, on June 1, 2023, Saidoff sent an email to Mr. Goldner about the Omega Option and stated, "The money to Omega will be wired today."

129.    In or about June, 2023, Goldner has his own issues and sought assistance from Capital and Saidoff.

According to Goldner, Saidoff agreed to help by influencing Goldner to lease or sub-lease Goldner Capital's 19 operating facilities to VHS and transfer all real estate.

**F.    Capital Directs Debtors to Exercise the Purchase Option under the 10th Amendment**

130.    On April 30, 2023, the Debtors, on behalf of itself and Capital exercised the 10th Amendment to the Omega lease to exercise and perform under the Purchase Option (the "Purchase Option Exercise").

131.    Capital was in agreement with the Purchase Option Exercise.

132.    The Purchase Option Exercise occurred to preserve the value of the Purchase Option.

133.    The Purchase Option Exercise was done by the Debtors on behalf of Capital.

134.    Omega had previously agreed that the Debtors could assign the Purchase option to Capital.

135.    Capital agreed to be the assignee on behalf of the Debtors of the Purchase Option.

136.    At the time of the Purchase Option Exercise, Capital and the Debtors had a great working relationship.

137.    The Purchase Option Exercise now required that the closing be held and the parties perform thereunder.

138.    Capital's actions, behavior, texts, and emails provided a clear and convincing promise and representation to the Debtors that the Purchase Option Exercise would be exercised for the Debtors and Capital.

During the months June through September, 2023, while the Debtors were transferring their operating entities to Capital and VHS, Capital was paying the Omega Purchase Option under the various Amendments, including the monthly lease payment for all 11 facilities.

G.    **Omega Defaults Debtors and Capital Negotiates a Separate Deal**

139.    On or about October 1, 2023, once the Debtors finished transferring their operating entities to VHS (19 in total), Capital voluntarily elected not to pay the monthly rent to Omega, as it had all of the Debtors' facilities transferred to VHS by this time.

140.    The prior course of conduct and dealing led Capital to rely on the continued monthly rent payments and the Purchase Option Exercise.

141.    On October 4, 2023, in response to Leighton Aiken's concern that the monthly rent was not paid, Michael Ackerman, Esq., Capital 's in-house general counsel, sent a text to Saidoff stating "this is your opening to get before Omega what you would need to proceed".

142.    According to the Debtors, Capital intended to go around the Debtors and negotiate for the Purchase Option away from the Debtor.

143.    According to the Debtors, Capital caused the default to Omega under the 11 facilities by not paying the monthly base rent, which was $536,296.39 per month in total.

144.    As a result of the failed rent payments, Omega sent a letter of default to the Debtors. Since there was a default in the base rent, that would also cause a default of the Purchase Option Exercise.

145.    As soon as Goldner leased the last remaining nursing home to VHS, Miller—at Capital 's direction—stopped paying rent for the 19 facilities, which caused the landlord entities and sub-landlord entities to default because they could not pay their debt service obligations.

146.    This was an important step in Miller and Capital 's improper attempt to take control over the Debtors' business operations.

147.    At the time, Goldner contacted Saidoff and asked why he was causing a default under the Omega Purchase option and Saidoff responded "don't worry, I know what I am doing".

148.    Goldner continued to ask for explanation from Saidoff in writing and on the phone and he continued to assure Goldner that the Debtors are fine and let him structure the deal points with Omega.

149.    At the time, the Debtors believed Saidoff was in control of the Omega Purchase Option and was acting on behalf of the Debtors.

150.    Capital and Saidoff exercised extensive control over the Debtors business affairs and operations.

151.    Capital and Saidoff have a twenty (20%) equity ownership interest in MT Holdings.

**H.    The Memoranda of Understanding**

152.    Goldner Capital and Capital restructured the Total Loans by two Memoranda of Understanding ("MOUs") dated May 31, 2023 ("First MOU") and June 1, 2023 ("Second MOU").

153.    The MOUs contained (1) a waterfall agreement for the assets Capital had invested in and (2) the manner in which those assets would be liquidated and paid.

22

154.    The first MOU contemplated an assignment of the Purchase Option to Capital and a profit sharing between the parties. This critical piece had enormous value for Capital and was part of the collateral provided to Capital. In all events, during all times, according to the Debtors, Capital was completely oversecured.

155.    The second MOU provided for a transfer of operations to new operators (owned or controlled by VHS) and terminated the leases of facilities with existing operators and providing for leases to new operators, with accounts receivable to be allocated between existing and new operators based on the date of service.

156.    According to Goldner, Saidoff directed that the rent be used to pay the Total Loans to Capital directly, in full, before any rents would be paid to Goldner Capital landlord entities.

157.    Without VHS's monthly rental income of approximately $800,000, Goldner Capital's subsidiary could not afford to pay the $546,000 in monthly rent due to Omega for the Missouri locations.

158.    As a result of the default that Saidoff, Miller, VHS, and Capital orchestrated, Omega terminated Goldner Capital's Purchase Option which was worth $42.6 million to $60.35 million.

159.    After forcing the default under the Lease containing the Purchase Option, Capital by passed the Second MOU and took the Purchase Option for itself.

160.    When Capital stopped VHS's rental payments to the Debtors, the Debtors became unable to pay the debt service to Capital or other lenders.

161.    Once Capital acquired the Omega Purchase Option containing 11 facilities and the 19 other facilities that the Debtors transferred to VHS under the auspices of Saidoff, Capital elected to terminate the relationship and take over the Debtors' entire business enterprise.

162.    Capital then fabricated default notices under the Total Loans and purported to seize the Debtor's assets and control without the Debtor having an opportunity to cure.

Despite the bankruptcy, Capital has directed lenders, vendors, and third parties that Goldner has no managerial authority, causing an avalanche of defaults.

## I.    <u>Capital's Fabricated Notice of Default</u>

163.    By notices dated September 27, 2024 Capital attempted to sell, at a private UCC sale, GCM's ownership interest in at least four of GCM's operating entities with a sale date as soon as October 7, 2024, ten days later.

164.    Capital and VHS's conspiracy to harm Goldner Capital's companies continues today as they devalued the companies' assets by operating the skilled nursing facilities below the standard of care affecting the Debtors enterprise value.

165.    VHS's operational record is among the worst skilled nursing home operators in the nursing home industry.

166.    Since June 2023, across the 19 facilities at issue, VHS nursing homes have been fined more than $Million based on the January 24th 2025 CMS report.

167.    VHS has an overall average star rating of 1 star across its facilities and an average staffing rating of 1 star.

168.    VHS does not operate a single 5 or 4 star facility—the only 3 star facility that VHS operates was a 5 star at the time of transition.

169.    Approximately one-third of the VHS facilities have been assigned a red hand for abuse, which CMS assigns to warn consumers when a facility has been cited for abuse under 42 CFR § 483.12.

170.    Across its 19 facilities, since June 2023, VHS has received over 40 Immediate Jeopardies or higher citations, 45 G (harm level) citations, and more than 400 overall citations 586 citations per the CMS 2025 report.

171.    Of the 256 nursing home chains that operate 10 facilities or more in the USA, VHS is in the bottom 10% for star ratings, Immediate Jeopardies, G tags, and overall surveys as well as failed Special Focus surveys.

172.    Because VHS has operated the facilities in such a reckless manner, it has damaged the value of Debtors' assets, which furthers Capital's goal to financially destroy the Debtors.

173.    Through the effort, actions and behavior of Capital and VHS, the enterprise value of the Debtors businesses, through its real estate holdings and business operations, has been destroyed.

**J.    Capital Violations of Section 362 of the Bankruptcy Code**

174.    Despite the bankruptcy and automatic stay, Capital has advised lenders and third parties that Goldner had no managerial rights.

175.    Despite the bankruptcy, Capital has been vocal in causing defaults.

176.    Capital's post-bankruptcy actions and behavior violate Section 362 of the Bankruptcy Code.

177.    Capital has taken a litigation posture prior to the Court ruling on the dismissal motion that Goldner has no authority to manage the Debtors.

178.    Allowing Capital to manage the Debtors would further strip all of the Debtors' enterprise value and be akin to allowing the fox into the hen house.

## COUNT ONE
### Fraudulent Conveyance — Purchase Option
### (Debtors against Capital Foresight)

179.    Debtors adopt and incorporate herein all prior factual allegations.

180.    Under Section 3 of the MOU, Capital Foresight received an assignment of the Purchase Option.

181.    This transfer was made within two years of the petition date.

182.    Capital Foresight was negotiating its own deal with Omega and Capital Foresight did not provide the value it promised in the MOU.

183.    The Debtors, therefore, received less than the reasonably equivalent value of the Purchase Option and Capital Foresight improperly benefitted from the transfer.

184.    Consequently, the transfer is voidable under 11 U.S.C. § 548.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership,  voiding the transfer under 11 U.S.C. § 548, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT TWO
### Fraudulent Conveyance — Town & Country
### (Debtors against Capital Source)

185.    Debtors adopt and incorporate herein all prior factual allegations.

186.    To offset the loan amount, GCM sold Town and Country to Capital Source, LLC for approximately $15 million less than fair market value, and this was included in the waterfall agreement with the MOU.

187.    This transfer was made within two years of the petition date.

188.    Capital Source, LLC did not provide the value it promised in the MOU.

189.    The Debtors, therefore, received less than the reasonably equivalent value of the Purchase Option and Capital Source, LLC improperly benefitted from the transfer.

190.    Consequently, the transfer is voidable under 11 U.S.C. § 548.

WHEREFORE, Debtors demand judgment against Capital Source, LLC, voiding the transfer under 11 U.S.C. § 548, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

**COUNT THREE**
**Equitable Subordination**
**(Debtors against Capital Foresight & Capital Source)**

191.    Debtors adopt and incorporate herein all prior factual allegations.

192.    At all times relevant, Capital engaged in inequitable conduct by colluding with VHS to deprive Debtors' entities of rent and manufacture default under the Omega Purchase Option and default under Capital's loans.

193.    At all times relevant, Capital engaged in inequitable conduct by taking the Omega Purchase Option for itself and obtaining Town & Country under fair market value.

194.    At all times relevant, Capital engaged in inequitable conduct by obtaining value from Debtors that exceed the amount Debtors owe Capital.

195.    Capital engaged in this inequitable conduct to take property and value from Debtors, but also to foreclose on the Pledge Agreements and attempt a hostile takeover of Debtors' management.

196.    At all times relevant, Capital engaged in a course of conduct contrary to good faith and fair dealing.

197.    The equities in this case dictate that the amounts Debtors allegedly owe to Capital pursuant to the Loan should be subordinated to the claims of all of the Debtors' other creditors under 11 U.S.C. § 510(c).

198.    Such equitable subordination is necessary because Capital's inequitable conduct provided Capital with an unfair advantage and resulted in an injury to the Debtors' creditors.

199.    Equitable subordination of Capital's claim is consistent with the Bankruptcy Code.

200.    As a result of such inequitable conduct, the Debtors incurred additional and unnecessary legal fees of at least $250,000.

201.    By reason of the foregoing, Capital's claim against the Debtors should be equitably subordinated to the claims of all administrative and general unsecured creditors pursuant to § 510(c) of the Bankruptcy Code.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally, subordinating their claims under § 510(c), together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

### COUNT FOUR
**Disgorgement Of Profits & Rents**
**(Debtors against All Defendants)**

202.    Debtors adopt and incorporate herein all prior factual allegations.

203.    At all times relevant, Capital engaged in inequitable conduct by colluding with VHS and its Tenant Entities to deprive Debtors' entities of rent and manufacture default under the Omega Purchase Option and default under Capital's loans.

204.    At all times relevant, Capital engaged in inequitable conduct by taking the Omega Purchase Option for itself and obtaining Town & Country under fair market value.

205.    At all times relevant, Capital engaged in inequitable conduct by obtaining value from Debtors that exceed the amount Debtors owe Capital.

206.    Capital engaged in this inequitable conduct to take property and value from Debtors, but also to foreclose on the Pledge Agreements and attempt a hostile takeover of Debtors' management.

207.    To date, VHS and its Tenant Entities have wrongfully retained over $31MM in unpaid rent.

208.    VHS and its Tenant Entities have channeled the unpaid rent to Capital.

209.    Capital, VHS, and the Tenant Entities have obtained windfalls, rents, and profits from their wrongful and/or inequitable conduct and this Court should disgorge those amounts from the Defendants.

210.    Capital, VHS, and the Tenant Entities' wrongful conduct proximately caused Debtors' harm.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership, Capital Source, LLC, Vertical Health Services, LLC, and the Tenant Entities, jointly and severally,  disgorging all rents, profits, and windfalls, including in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT FIVE
### Breach of Contract — Unpaid Rent
### (Debtors against VHS and the Tenant Entities)

211.    Debtors adopt and incorporate herein all prior factual allegations.

212.    VHS and its Tenant Entities entered into contracts with Debtors and their entities for 19 facilities under which VHS and its Tenant Entities agreed to pay rent.

213.    VHS and its Tenant Entities breached those contracts by failing and/or refusing to pay over $31MM in rent that is past due and owing.

214.    As a proximate result of VHS and its Tenant Entities' breach, Debtors were harmed.

215.    Under the applicable contracts, Debtors are entitled to their attorneys' fees and litigation expenses.

WHEREFORE, Debtors demand judgment against Vertical Health Services, LLC and the Tenant Entities, jointly and severally, in a sum of compensatory damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT SIX
### Violation of 6 DE Code § 9-625
### (Debtors against Capital Foresight & Capital Source)

216.    Debtors adopt and incorporate herein all prior factual allegations.

217.    Capital Foresight sent default notices under the Loan dated September 27, 2024 indicating Capital Foresight attempted to sell, at a private UCC sale, GCM's ownership interest in at least four of GCM's operating entities with a sale date as soon as October 7, 2024. The proposed UCC sale was not have been commercially reasonable as Capital Foresight: (i) did not engage a qualified auctioneer or broker; (ii) did not advertise the sale in a manner that would maximize value; and (iii) did not provide information to potential buyers about the Debtors' companies. Capital also sought to credit bid at the UCC sale against no competing offers to (again) take the substantial value of the Debtors' assets and operating entities for itself.

218.    Under § 9-610, a secured party must dispose of collateral via commercially reasonable methods. The requirement that the disposition of collateral be commercially reasonable cannot be waived and any contrary provision in Article 4 of the Pledge Agreement is void.

219.    Capital Foresight's conduct in wrongly conspiring to starve the Debtors of rental income and thereby forcing the Debtors' default under the Loan, and taking Debtors' Purchase Option for themselves constituted breaches of the implied covenant of good faith and fair dealing that precludes their attempted sell from being commercially reasonable.

220.    Additionally, Capital Foresight must give Debtors reasonable notice of the time and place of a public sale of the collateral, or reasonable notice of the time after which any private sale is to take place. By providing only 10 days' notice of the sale, Capital Foresight did not propose to conduct the sale in a commercially reasonable manner.

221.    By proposing to conduct a private sale, instead of a public sale, Capital did not propose to dispose of the collateral in the usual manner on a recognized market or in conformity with reasonable commercial practices among similar types of collateral.

222.    Capital's notice did not give Debtors an opportunity to protect their interests in the collateral by exercising any right of redemption or by bidding at the sale, to challenge any aspect of the disposition before it is made, or to interest potential purchasers in the sale.

223.    Because of Capital's noncompliance, this Court should order or restrain collection, enforcement, or disposition of the collateral.

224.    Debtors have suffered financial damages as the proximate result of Capital's noncompliance.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally,  in a sum of compensatory, statutory

and/or punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, together with an order of noncompliance that restrains collection, enforcement, or disposition of collateral, as well as such other, further, and different relief as this Court deems necessary and proper.

**COUNT SEVEN**
**Tortious Interference — Rental Income**
**(Debtors against Capital Foresight & Capital Source)**

225.    Debtors adopt and incorporate herein all prior factual allegations.

226.    Debtors and their companies (the "<u>Landlords</u>") had contracts with VHS and its Tenant Entities wherein VHS and its Tenant Entities would pay monthly rent to Landlords.

227.    Acting on behalf of Capital Foresight and Capital Source, Saidoff influenced Landlords to lease the facilities to VHS and its Tenant Entities.

228.    Capital Foresight and Capital Source were aware of the contracts and rental obligations between Landlords and VHS and its Tenant Entities.

229.    As part of their strategy to financially harm Debtors and steal the Purchase Option set forth *supra*, Capital Foresight and Capital Source interfered with the contracts between Landlords and VHS and its Tenant Entities, instructed VHS and its Tenant Entities to not pay monthly rent, and caused Tenants to breach their rental obligations.

230.    Capital Foresight and Capital Source's intentional interference, and VHS and its Tenant Entities' breaches, was the proximate cause of Debtors' harm.

231.    VHS and its Tenant Entities' breaches caused Debtors to default on the Purchase Option with Omega, which resulted in losing the Purchase Option.

232.    These breaches also rendered the Debtors unable to make their payments to Capital.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally, in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT EIGHT
### Tortious Interference — Purchase Option
### (Debtors against All Defendants)

233.    Debtors adopt and incorporate herein all prior factual allegations.

234.    Debtors adopt and incorporate herein all prior factual allegations.

235.    Landlords had contracts with VHS and its Tenant Entities wherein VHS and its Tenant Entities would pay monthly rent to Landlords.

236.    Acting on behalf of Capital Foresight and Capital Source, Saidoff influenced Landlords to lease the facilities to VHS and its Tenant Entities.

237.    Capital Foresight, Capital Source, VHS, and the Tenant Entities were aware of the contract between Debtors and Omega containing the Purchase Option.

238.    As part of their strategy to financially harm Debtors and steal the Purchase Option set forth *supra*, Capital Foresight and Capital Source interfered with the contracts between Landlords and VHS and its Tenant Entities, instructed VHS and its Tenant Entities to not pay monthly rent, and caused VHS and its Tenant Entities to breach their rental obligations. This caused Debtors to breach the contract between Debtors and Omega containing the Purchase Option.

239.    Capital Foresight, Capital Source, VHS, and the Tenant Entities' intentional interference was the proximate cause of Debtors' harm.

240.    Capital Foresight, Capital Source, VHS, and the Tenant Entities' intentional interference caused Debtors to default on the Purchase Option with Omega, which resulted in losing the purchase option.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership, Capital Source, LLC, Vertical Health Services, LLC, and the Tenant Entities, jointly and severally,  in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

<u>**COUNT NINE**</u>
**Breach of Fiduciary Duty**
**(Debtors against Capital Foresight & Capital Source)**

241.    Debtors adopt and incorporate herein all prior factual allegations.

242.    Saidoff positioned himself as a trusted advisor to Goldner, which allowed him to participate in Debtors' pursuit of the Purchase Option

243.    Debtors and Capital intended to join together in a venture to obtain the Purchase Option from Omega.

244.    Debtors and Capital executed a MOU whereby they agreed to share profits, and by implication losses, for the venture and Capital would invest in the venture.

245.    By virtue of its relationship with Debtors, Capital owed Debtors a fiduciary duty.

246.    Capital breached that duty when it (1) worked with VHS and its Tenant Entities to stop paying rent at the Debtors' facilities, (2) negotiated separately with Omega to obtain the Purchase Option, (3) induced Debtors' breach with Omega and loss of the Purchase Option, (5) stole the purchase option from Debtors and bypassed the profit sharing arrangement, (6) attempted

a hostile takeover of the Debtors' entities and management, and (7)  went directly to Debtors' secured lenders and attempted to negotiate deals that would harm Debtors.

247.    Debtors were harmed as a proximate result of Capital's breaches.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally,  in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

### COUNT TEN
### Aiding & Abetting Breach of Fiduciary Duty
### (Debtors against VHS and the Tenant Entities)

248.    Debtors adopt and incorporate herein all prior factual allegations.

249.    Capital breached the duty it owed Debtors when it (1) worked with VHS and its Tenant Entities to stop paying rent at the Debtors' facilities, (2) negotiated separately with Omega to obtain the purchase option, (3) induced Debtors' breach with Omega and loss of the Purchase Option, (5) stole the purchase option from Debtors, and (6) attempted a hostile takeover of the Debtors' entities and management.

250.    VHS and its Tenant Entities, by refusing to pay rent to Debtors' companies, knowingly participated and substantially assisted in Capital's breaches of fiduciary duty.

251.    Debtors were harmed as a proximate result of Capital's breaches and by the VHS and Tenant Entities' aiding and abetting of such breaches.

252.    As a proximate result of VHS and its Tenant Entities' failure to pay rent, and aiding and abetting Capital's breaches of fiduciary duty, Debtors lost the Purchase Option and suffered other damages.

WHEREFORE, Debtors demand judgment against Vertical Health Services, LLC and the Tenant Entities, jointly and severally, in a sum of compensatory and/or punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT ELEVEN
**Breach of Contract**
**(Debtors against Capital Foresight)**

253.    Debtors adopt and incorporate herein all prior factual allegations.

254.    The MOU established a contractual agreement and obligation for Capital and Debtors to jointly pursue the Purchase Option.

255.    Capital breached the MOU when it caused VHS to stop paying rent to Debtors. Without VHS's monthly rental income of approximately $800,000, GCM's subsidiary could not afford to pay the $546,000 in monthly rent due to Omega for the Missouri locations. As a result, Omega terminated GCM's Purchase Option which was worth $42.6 million to $60.35 million.

256.    Capital also breached the MOU, after forcing default under the lease, when it took the Purchase Option for itself instead of obtaining the Purchase Option jointly. Capital, therefore, bypassed the profit sharing arrangement and took value from Debtors far in excess of the amount Debtors owed under the Loan.

257.    Capital's breach was the proximate cause of Debtors' harm.

258.    Under the contract, Debtors are also entitled to their attorneys' fees and litigation expenses.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership, jointly and severally,   in a sum of compensatory damages in excess of the

jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT TWELVE
### Breach of The Implied Covenant of Good Faith and Fair Dealing
### (Debtors against Capital Foresight & Capital Source)

259.    Debtors adopt and incorporate herein all prior factual allegations.

260.    The MOU established a contractual agreement and obligation for Capital and Debtors to jointly pursue the Purchase Option.

261.    The MOU, like all contracts, contained an implied covenant of good faith and fair dealing.

262.    Capital breached the implied covenant of good faith and fair dealing when it caused VHS and its Tenant Entities to stop paying rent to Debtors. Without VHS and its Tenant Entities' monthly rental income of approximately $800,000, GCM's subsidiary could not afford to pay the $546,000 in monthly rent due to Omega for the Missouri locations. As a result, Omega terminated GCM's Purchase Option which was worth $42.6 million to $60.35 million.

263.    Capital also breached the implied covenant of good faith and fair dealing, after forcing default under the lease, when it took the Purchase Option for itself instead of obtaining the Purchase Option jointly. Capital, therefore, bypassed the profit sharing arrangement and took value from Debtors far in excess of the amount Debtors owed under the Loan.

264.    By diverting away the fruit of Debtors' venture with Capital, and engaging in the scheme with VHS as descried *supra*, Capital breached the implied covenant of good faith and fair dealing.

265.    Capital's breach was the proximate cause of Debtors' harm.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally, in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

### COUNT THIRTEEN
**Unjust Enrichment — Town & Country**
**(Debtors against Capital Foresight & Capital Source)**

266.     Debtors adopt and incorporate herein all prior factual allegations.

267.     Debtors sold Town and Country to Capital for approximately $15 million less than its actual value to offset the Loan amount as well as to be included in the waterfall agreement in the MOU.

268.     When Debtors transferred Town and Country to Capital, Capital unjustly enriched at Debtors' expense because Debtors did not obtain the fruits of Debtor and Capital's venture.

269.     Due to Capital's actions where it worked with VHS to destroy Debtors and take the Purchase Option, it is against equity and good conscience to allow Capital to obtain the benefit from its acquisition of Town and Country.

270.     Debtors were harmed as the proximate result of Capital's unjust enrichment through obtaining Town and Country for $15 million less than its actual value.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally, in a sum of compensatory damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different

relief as this Court deems necessary and proper.

## COUNT FOURTEEN
### Civil Conspiracy
### (Debtors against all Defendants)

271.    Debtors adopt and incorporate herein all prior factual allegations.

272.    Capital Foresight, Capital Source, VHS, and the Tenant Entities entered into an agreement to commit the wrongful acts alleged in this complaint.

273.    There was an over act in furtherance of the agreement, including, but not limited to, VHS and its Tenant Entities' refusal to pay rent, engineering Debtors' default, and the hostile takeover of the Debtor LLCs and their management.

274.    The parties intentionally participated in the furtherance of the plan or purpose to commit the wrongful acts here, including, but not limited to, the hostile takeover of Debtors and taking Debtors' assets, such as the Option, for their own benefit.

275.    As a proximate result of Capital Foresight, Capital Source, VHS, and the Tenant Entities' tortious and/or wrongful acts, Debtors were harmed.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership, Capital Source, LLC, Vertical Health Services, LLC, and the Tenant Entities, jointly and severally,  in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

## COUNT FIFTEEN
### Declaratory Judgment — Capital Does Not Control Debtors' Management
### (Debtors against Capital Foresight & Capital Source)

276.    Debtors adopt and incorporate herein all prior factual allegations.

277.     A justiciable controversy exists between Debtors and Capital over who controls Debtors' management.

278.     Capital never obtained control over GCM because GCM's LLC agreement expressly prohibits the transfer of membership interests. Article X, Section 10.1; "No Member shall transfer all of part of his Company interest except as provided in this Section X of this Agreement [which exceptions are inapplicable]. In the event that a Member … violates any provision of this Section X of this Agreement, such transfer shall be null and void ab initio and of no force and effect."

279.     Capital never obtained control over GCM Manager because GCM Manager's LLC agreement does not authorize membership interest transfers. Although GCM Manager's LLC agreement had previously authorized a transfer of membership interests, when the Pledge Agreement was signed on May 20, 2022, such authority in GCM Manager's operating agreement had already been removed.

280.     Capital never obtained managerial control over the other Debtors because the LLC agreements provide that only the Debtors' members can replace their Manager and GCM is not a member of any of the other Debtors. Thus, any pledge of membership interests by GCM Manager (even if authorized, which it was not) did not change the identity of the other Debtors' Managers.

281.     Under the Delaware LLC Act, Capital was not entitled to "to become or to exercise any rights or powers of a member" and, instead, was only entitled "to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned." *See* 6 Del. Code Section 18-702(b). Because Capital could not exercise voting rights, it could not remove any Debtor's manager.

282.    Capital never obtained control rights because neither the GCM LLC agreement, nor the GCM Manager LLC agreement, provide that a transfer of a membership interest (even if authorized and again, they were not) carries with it a transfer of control rights, as opposed to just economic rights.

283.    Capital never obtained control over GCM Parkside and/or GCM UP because Samuel Goldner, individually, is the Manager of those companies, not GCM Manager.

284.    Capital forfeited any purported right to control Debtors' management when it breached, among other things, the implied covenant of good faith and fair dealing by forcing defaults that caused the Debtors to lose the benefits they were supposed to obtain from the Loan, including the Purchase Option having a value of more than $42 million.

285.    Capital's conduct in wrongly conspiring to starve the Debtors of rental income thereby forcing the Debtors' default under the Loan, and converting the Debtor's Purchase Option for themselves that was worth more than $42 million, both constituted breaches of the implied covenant of good faith and fair dealing. Moreover, by claiming it had managerial control over the various Debtors, Capital Foresight owed a fiduciary duty to the creditors and equity holders of these estates. Thus, Capital Foresight as the purported manager, by blindly allowing a UCC sale of all the Debtor's assets and not maximizing the asset values for the creditors and equity holders of the Debtors it breached its fiduciary duty. Indeed, Capital Foresight attempted to be at the same time the Debtors, the lender and the tenant.

WHEREFORE, Debtors request judgment against Capital Source, LLC and The Capital Foresight Limited Partnership declaring that (1) Capital never obtained control rights and (2) Samuel Goldner and/or GCM Manager remains Debtors' manager, together with interest and

41

associated legal fees from the date of the breach, the costs of this action, as well as other, further, and different relief as this Court deems necessary and proper.

## COUNT SIXTEEN
### § 362 Violation
### (Debtors against Capital Foresight & Capital Source)

286.    Debtors adopt and incorporate herein all prior factual allegations.

287.    Based on the foregoing actions, Capital's post-bankruptcy actions and behavior violate Section 362 of the Bankruptcy Code.

WHEREFORE, Debtors demand judgment against The Capital Foresight Limited Partnership and Capital Source, LLC, jointly and severally,  in a sum of compensatory and punitive damages in excess of the jurisdictional limits of this Court, which will fairly and adequately compensate Debtors for the damages and emotional distress they sustained, together with interest from the date of the incident, attorneys' fees, expenses, and costs of the proceeding, as well as such other, further, and different relief as this Court deems necessary and proper.

Dated: February 14, 2025
        Wantagh, New York

**LaMONICA HERBST & MANISCALCO, LLP**
*General Counsel to Chapter 11 Debtors*

By:    <u>*s/ Joseph S. Maniscalco*</u>
       Joseph S. Maniscalco, Esq.
       Lon J. Seidman, Esq.
       Partners of the Firm
       3305 Jerusalem Avenue, Suite 201
       Wantagh, New York 11793
       Tel. (516) 826-6500

Dated:  February 14, 2025
        Nashville, TN

**McGlinchey Stafford, PLLC**
*Special Litigation Counsel to Chapter 11 Debtors*

<u>*/s/ T. Dylan Reeves*</u>
T. Dylan Reeves (pro hac vice)
333 Commerce St., Suite 1425
Nashville, TN 37201
(615) 762-9050 (telephone)
(615) 296-4716 (facsimile)